**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **TERRI LYNETTE PERRELL** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil No. WGC-05-458** |
| ) | |
| **CHRISTOPHER BROUS**, *et al.* ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**MEMORANDUM OPINION**

Plaintiff, a female police officer with the Washington Suburban Sanitary Commission ("WSSC") Police Department, brought this action against Chief Christopher Brous, Deputy Chief Howard Shook and WSSC alleging three counts of sex discrimination and retaliation, in violation of 42 U.S.C. §§ 1983, 1985(3), 1986. The parties consented to proceed before a United States Magistrate Judge for all further proceedings and the entry of a final judgment. *See* Doc. No. 22. The case was assigned to the undersigned. *See* Doc. No. 23. Pending before the court and ready for resolution is Defendants' Motion for Summary Judgment (Doc. No. 34). Plaintiff filed an Opposition (Doc. Nos. 37-38) and Defendants a Reply (Doc. No. 43). With the court's permission, *see* Doc. No. 51, Plaintiff filed a Surreply (Doc. No. 47). Also pending and ready for resolution is Defendants' Motion to Strike Portions of Plaintiff's Affidavits and Exhibits Appended to Opposition to Motion for Summary Judgment (Doc. No. 44). Plaintiff filed an Opposition (Doc. No. 49) and Defendants a Reply (Doc. No. 50). No hearing is deemed necessary and the court now rules pursuant to Local Rule 105.6 (D. Md. 2004).

## I.  BACKGROUND

Terri Perrell began her employment with WSSC in 1992 as a Security Guard and was

promoted to the position of Watershed Patrol Officer in 1997.  Pl.'s Mem. Law Supp. Opp'n

("Pl.'s Mem."), Ex. A (Perrell Aff. ¶¶3-4); Defs.' Mem. P. & A. Supp. Mot. Summ. J. ("Defs.'

Mem."), Ex. 2 (Perrell Dep. 7:12 - 21).  On October 1, 2003, the WSSC security force became a

police department.  *Id.*, Ex. 3 (Brous Dep. 39:2 - 11).  Ms. Perrell's position was retitled to

Police Officer in 2004.  *Id.*, Ex. 2 (Perrell Dep. 7:22 - 8:4).

Christopher Brous is the Chief of Police and the Group Leader of Security Safety

Services Group at WSSC.  *Id.*, Ex. 3 (Brous Dep. 7:7 - 14).  He was hired in January 2001.  Mr.

Brous oversees the daily operation of the security mission at WSSC.  *Id.*, Ex. 3 (Brous Dep. 7:15

- 8:2).  Howard Eugene (Gene) Shook is the Deputy Chief of Police at WSSC.  He began his

employment with WSSC in February 2001 as an internal investigator.  *Id.*, Ex. 4 (Shook Dep.

5:14 - 20).  Sometime in 2003, Mr. Shook was promoted to his current position as Deputy Chief

of Police.  His duties consist of overseeing the daily operations of the patrol unit.  *Id.*, Ex. 4

(Shook Dep. 5:9 - 11).  "WSSC is a bi-county governmental body corporate operating in Prince

George's County, Maryland and Montgomery County, Maryland."  Am. Compl. ¶ 4; *see* Brous'

Answer ¶ 4; Shook's Answer ¶ 4; WSSC's Answer ¶ 4.

On February 25, 2004, Deputy Chief Shook appointed Officer Perrell as the acting

supervisor or Acting Lieutenant of the Watershed Patrol Unit, due to the extended medical leave

of absence of Lieutenant Tony Frye.  *See* Defs.' Mem., Ex. 8.  The Watershed Patrol Unit was a

specialized unit separated from the Operations Patrol Section.  *Id.*, Ex. 2 (Perrell Dep. 8:13 - 17);

Ex. 3 (Brous Dep. 16:1 - 4); Ex. 4 (Shook Dep. 9:16 - 10:5).  Deputy Chief Shook selected

2

Officer Perrell because "she seemed relatively dedicated, seemed eager to work towards a common goal that we had established." *Id.*, Ex. 4 (Shook Dep. 17:19 - 21).

At the time of her appointment Officer Perrell did not believe it was a permanent position. It was her understanding that she was filling in for Lieutenant Frye during his absence. *Id.*, Ex. 2 (Perrell Dep. 59:18 - 60:4). Officer Perrell understood that Deputy Chief Shook "wanted me to keep the Watershed going, run it until we knew definitely what was happening [with Lieutenant Frye]." *Id.*, Ex. 2 (Perrell Dep. 59:7 - 8). As the Acting Lieutenant, Officer Perrell supervised three guards. *Id.*, Ex. 2 (Perrell Dep. 62:6 - 11).

On March 22, 2004, Deputy Chief Shook sent an e-mailed to "#Operations Patrol Group" and to Chief Brous. The e-mail message, entitled Anticipated Schedule Changes, states:

> Once again, we are experiencing manpower shortages within our unit. It appears that our current schedule is no longer workable considering the number of Officers we have on board. With this in mind, Charlie Simmons and I are attempting to configure a new work schedule which will provide adequate coverage, help reduce overtime expenditures and still provide our members with decent days off. The purpose of this e-mail is to solicit your input into the anticipated changes, before they become finalized. I encourage each of you to express your feelings concerning these changes and rest assured that your input will be evaluated prior to any permanent changes being made. Please note that we are in the process of hiring 9 new officers. After this hiring process is complete, this may well ease the current situation in which we find ourselves. Please submit your ideas, prototype schedules etc. to me as soon as possible.

Pl.'s Mem., Ex. E, at 1.

Sometime in March 2004, Deputy Chief Shook informed Acting Lieutenant Perrell of the forthcoming schedule change as a supervisory courtesy and to obtain her support as part of the administration. Deputy Chief Shook asked Acting Lieutenant Perrell to keep this information to herself because "I don't want the rumors floating around before we have an opportunity to

explain it at the meeting."  Defs.' Mem., Ex. 4 (Shook Dep. 14:10 - 12).  According to Deputy

Chief Shook, Acting Lieutenant Perrell became upset when told about the schedule change and

remarked that it was going to interfere with her child care arrangements and also going to cost

her another day of child care.  *Id.*, Ex. 4 (Shook Dep. 14:16 - 19).  Deputy Chief Shook

attempted to explain the change was necessary because the WSSC police department does not

employ enough personnel.  Acting Lieutenant Perrell then suggested that no voluntary training

be permitted for a year until more personnel are hired.  Deputy Chief Shook responded that her

suggestion was not an option.  *Id.*, Ex. 4 (Shook Dep. 14:19 - 15:5).  Acting Lieutenant Perrell

confirms that Deputy Chief Shook spoke with her about the schedule change.  She concedes she

was not happy.  *Id.*, Ex. 2 (Perrell Dep. 86:1 - 11).

    According to Deputy Chief Shook, Acting Lieutenant Perrell breached confidentiality by

telling others about the forthcoming schedule change.

> A:  Later that afternoon – – and I'm not sure how much later, but I'm
> relatively sure it was the same day – – I started getting – – I got a
> phone call from an officer, inquiring about what the new schedule
> was all about.
>
>    I asked the officer where he had heard that and he told me [Acting
> Lieutenant Perrell] had called him and told him that the new schedule
> was "shit" and that we had no idea what we were doing.

*Id.*, Ex. 4 (Shook Dep. 15:11 - 19).

    Acting Lieutenant Perrell denies breaching confidentiality.

> Q:  So is it your recollection that you never breached confidentiality
> by telling any members of the department that a scheduled change
> was coming prior to it being announced to the full staff?
>
> A:  I don't believe I breached any confidentiality, no.
>
> Q:  You don't remember doing that?

A:  No.

*Id.*, Ex. 2 (Perrell Dep. 88:1 - 8).

A meeting was subsequently convened in March 2004 where management informed the employees of the schedule change.  Management expected the rank and file would not receptive to the change because it was a less desirable schedule.  *Id.*, Ex. 3 (Brous Dep. 51:13 - 19).  At this same meeting, the Watershed Patrol Unit was officially closed and the officers assigned to that unit were integrated with the rest of the WSSC police department.  *Id.*, Ex. 3 (Brous Dep. 17:20 - 18:5), Ex. 4 (Shook Dep. 11:9 - 17).  In other words, all officers would be titled "police officers" rather than categorized as either "watershed patrol officer" or "operations patrol officer."  Also, at the meeting, new job descriptions were distributed to the employees.

Deputy Chief Shook removed Officer Perrell as the Acting Lieutenant, Supervisor of the Watershed Patrol, on May 25, 2004.  *See id.*, Ex. 15.  Charles Simmons was appointed as Acting Lieutenant.  According to Deputy Chief Shook he sat down with Officer Perrell and explained to her why she was being removed as acting supervisor.

> A:   I explained everything to her and my reasons for doing what I was doing.  And I made it – – I thought I made it clear to her that this change would not affect her either ability or chances of being promoted sometime in the future, but she needed to obtain some sort of supervisory training.  She had limited experience in supervision and had no training in supervision.

*Id.*, Ex. 4 (Shook Dep. 26:2 - 10).

During that same conversation Deputy Chief Shook gave Officer Perrell a copy of the Maryland Police Training Commission training calendar listing supervisory classes for the remainder of the year.  "I then pointed out to her that there was a class coming up in June, and she said that she either had some commitments or it just wouldn't work in June."  *Id.*, Ex. 4

5

(Shook Dep. 26:11 - 14).

According to Officer Perrell, Deputy Chief Shook did provide her a schedule of upcoming supervisory classes but this occurred while she was an acting supervisor and her removal was not under discussion.  *Id.*, Ex. 2 (Perrell Dep. 89:18 - 90:16).  Officer Perrell confirms an upcoming class was in June and confirms she was unavailable to attend.

> A:  And I said well, I would definitely be interested in doing it.  But at that time my kids were still in school, and if there was a later date class, I thought that would be great.  So he handed me the packet.  He said here is [sic] other dates.
>
> And there was a class for June in there.  And I think at the time of that class was around my family vacation that I had planned.

*Id.*, Ex. 2 (Perrell Dep. 91:4 - 11).

On June 30, 2004, Officer Perrell was working the evening shift.  Sometime between 10:30 - 10:45 p.m., she stopped by Chief Brous' office.  He asked her, "how's it going?"  Chief Brous could tell from Officer Perrell's body language that something was wrong.  Officer Perrell responded that she could not talk about it and left the office.

Thirty to forty minutes later, Officer Perrell returned to Chief Brous' office, sat down and began crying uncontrollably.  She described how Deputy Chief Shook treated her and how she had been removed from the acting position without any explanation or reason.  The conversation between Chief Brous and Officer Perrell lasted about an hour and a half.  *Id.*, Ex. 3 (Brous Dep. 46:17 - 48:3).

Officer Perrell confirms that, after her shift ended, she returned to Chief Brous' office and told him that she wanted to discuss some issues.  "And I began with talking about the removal – – being removed.  And that I hadn't been given a reason why I had been removed

from the position." *Id.*, Ex. 2 (Perrell Dep. 184:4 - 7).  Officer Perrell believed she was giving

Chief Brous a few bits and pieces of what had happened but did not tell him the whole story.

> A:  I told him that [Deputy Chief Shook] had removed me, of course,
> from the position, and that I didn't understand why I had been
> removed from the position.  And he said, you mean [Deputy Chief
> Shook] didn't tell you that you had been removed.
>
> And I said no, that one of the things that [Deputy Chief Shook]
> said to me was that he accused me of having amnesia, all that sort of
> stuff.  And I was very vague with Chief Brous during that
> conversation because I was questioning, and I wasn't sure how much
> I wanted to tell him at that time.

*Id.*, Ex. 2 (Perrell Dep. 184:22 - 185:10).  Officer Perrell recalls speaking with Chief Brous for

about one hour.

Chief Brous trusted Officer Perrell.  He was very angry with Deputy Chief Shook.  The

next morning, July 1, 2004, Chief Brous went to Deputy Chief Shook's office, slammed the door

and confronted him with Officer Perrell's allegations.  Deputy Chief Shook denied the

allegations and presented a different set of facts.  Chief Brous was faced with a dilemma because

he trusted both Deputy Chief Shook and Officer Perrell, individuals telling completely different

stories.  Deputy Chief Shook suggested they meet with Officer Perrell when she arrived that

afternoon.  *Id.*, Ex. 3 (Brous Dep. 48:4 - 19).

When Officer Perrell arrived that afternoon, she and Deputy Chief Shook reported to

Chief Brous' office.  "Mr. Shook asked Ms. Perrell if it was true that she told me that she had

been removed from the position of acting watershed supervisor without being given the reasons

for her removal, at which time Ms. Perrell denied ever making those statements and changed her

story completely." *Id.*, Ex. 3 (Brous Dep. 49:2 - 8).  Deputy Chief Shook corroborates Chief

Brous.

A:   So when [Officer Perrell] got in that afternoon, I asked her to come into the chief's office with me.  We closed the door.  I said, "[Officer Perrell], did you tell the chief last night that I never explained to you why you were removed from this position?"

And she said, "Well, that's not exactly what I said."

[Chief Brous] – – at that time the chief says, "[Officer Perrell], that is exactly what you said."

I had heard all I needed to hear at that point.  I excused myself from the office.

*Id.*, Ex. 4 (Shook Dep. 44:1 - 11).

Chief Brous believed Officer Perrell made a false statement.  Specifically, she told him she had been removed as Acting Lieutenant without any explanation.  "Deputy Chief Shook's version was that he had multiple problems with Ms. Perrell, that she had been counseled a couple of times for her actions while she was in the role of watershed protection supervisor.  I know that to be the case because Deputy Chief Shook kept me up to speed on those things, as they were happening."  *Id.*, Ex. 3 (Brous Dep. 50:4 - 10).

According to Chief Brous, upon Officer Perrell denying that she made certain statements to Chief Brous the previous night, Deputy Chief Shook left the room and thereafter contacted the investigators for an internal investigation of Officer Perrell's statements.  *Id.*, Ex. 3 (Brous Dep. 65:13 - 66:4).  *See* Pl.'s Mem., Ex. F (Brous Dep. 59:8 - 11) ("A:   I did not do an investigation on this matter.  Deputy Chief Shook requested an investigation under the rules of LEOBR [Law Enforcement Officers' Bill of Rights] with our investigative section.").  On July 23, 2004, Officer Perrell was served with Interrogation Notice ICN: 04-07-23.  This Notice states, in pertinent part:

It is alleged that on June 30, 2004 and July 1, 2004, you made

8

> untruthful statements to Chief Christopher Brous and Deputy Chief
> Howard Shook of the Washington Suburban Sanitary Commission
> Police Department concerning operational and/or personnel matters
> relating to your position within the Washington Suburban Sanitary
> Commission Police Department, and when confronted, denied
> making those statements, in violation of WSSC Personnel
> Regulations, Regulations of the WSSC Police Department and your
> Oath of Office.

On August 4, 2004, an interrogation was conducted.  Officer Perrell was represented by counsel.  George Hubbard, Internal Investigator with the WSSC Police Department, inquired about Officer Perrell's conversation with Chief Brous on June 30, 2004, but did not inquire about her conversation with Chief Brous and Deputy Chief Shook on July 1, 2004.

On November 12, 2004, Helmut F. Bottjer, Deputy Chief of Police of the WSSC, addressed a letter to Officer Perrell.  The letter states, in pertinent part:

> Investigation of a complaint stemming from a conversation you had
> with Chief of Police, Christopher J. Brous on June 30, 2004 has been
> completed.  The complaint alleged that you gave false information to
> Chief Brous in violation of Washington Suburban Sanitary
> Commission official policy . . . .
>
> The conclusion of the investigation was that there was "insufficient
> evidence" to conclude that there was a violation of Commission
> policy.  I have reviewed the investigative report and concur with the
> findings of "Not Sustained."  As a result, this matter is now
> considered closed by this agency with no further action contemplated.

On that same day, Officer Perrell filed a three count Complaint and Petition for Injunctive Relief and an Order to Show Cause Pursuant to the Law Enforcement Officers' Bill of Rights with the Circuit Court for Prince George's County, Maryland, against Chief Brous and the WSSC.  On November 16, 2004, Charles Simmons, Acting Lieutenant, WSSC, was served with a five page letter, constituting an Equal Employment Opportunity ("EEO") complaint of gender discrimination, *quid pro quo* sexual harassment, and retaliation, from Officer Perrell's

attorney.  Defs.' Mem., Ex. 13.

On December 16, 2004, Chief Brous and WSSC filed a Motion to Dismiss Plaintiff's Complaint and Petition for Injunctive Relief and Order to Show Cause Pursuant to the Law Enforcement Officers' Bill of Rights.  "WSSC does not intend to pursue any disciplinary action against Plaintiff for the issue that gave rise to her Complaint. . . ."  Mot. to Dismiss ¶ 3.  "That because WSSC has closed the matter on which this Complaint is based and does not intend to take any disciplinary action against Plaintiff, there will be no hearing before any hearing board." *Id.* ¶ 8.  Officer Perrell filed an Opposition to the Motion to Dismiss.

On February 1, 2005, Officer Perrell filed an Amended Complaint, adding three counts (Counts IV - VI) alleging violations of her civil rights under 42 U.S.C. §§ 1983, 1985(3), 1986. In her Amended Complaint Officer Perrell added Deputy Chief Shook as a Defendant.  On February 4, 2005, Judge Lombardi of the Circuit Court for Prince George's County, Maryland convened a hearing on the Motion to Dismiss.  Judge Lombardi dismissed the original complaint and Counts I through III of the Amended Complaint.  On February 16, 2005, Defendants Chief Brous, Deputy Chief Shook and WSSC filed a Notice of Removal.  *See* Doc. No. 1.  The case was removed from State Court to Federal Court as of February 16, 2005.

On March 2, 2005, Officer Perrell filed a Motion for Reconsideration Pursuant to Maryland Rule 2-535(a), seeking reconsideration of Judge Lombardi's February 4, 2005 Order dismissing the original complaint and Counts I through III of the Amended Complaint.  In the Order of June 9, 2005, this Court denied Officer Perrell's Motion for Reconsideration.  *See* Doc. No. 30.  Therefore, only Counts IV through VI of the Amended Complaint, alleging civil rights violations under 42 U.S.C. §§ 1983, 1985(3), 1986, have not been resolved.

## II. <u>STANDARD OF REVIEW</u>

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrision v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950).  The moving party bears the burden of showing that there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56(c); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  The court may not weigh evidence or make credibility determinations.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Celotex Corp.*, 477 U.S. at 323.  However, on those issues on which the nonmoving party will have the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence.  *Anderson*, 477 U.S. at

256.

In *Celotex Corporation*, the Supreme Court stated:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file."  Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celox Corp.*, 477 U.S. at 324.

"'A mere scintilla of evidence is not enough to create a fact issue.'"  *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.  ANALYSIS

In determining whether the moving party has shown there are no genuine issues of any material fact, this Court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the nonmoving party.  *Tinsely v. First Union Nat'l Bank*, 155 F.3d 435, 438 (4th Cir. 1998).  Any disputed facts between Officer Perrell and the Defendants (Chief Brous, Deputy Chief Shook and WSSC) will be viewed in the light most favorable to Officer Perrell and all inferences will be drawn in Officer Perrell's favor.

A.      *Defendants' Untimely Reply*

In her Surreply Plaintiff asks the court to disregard Defendants' Reply as untimely.

Defendants filed their Reply three days late.  Defendants' counsel apparently relied upon the

date counsel agreed upon which differed from the date listed in the court's Order.  Defendants'

counsel should have noticed this difference.  The court finds no prejudice to Plaintiff and thus

will deny Plaintiff's request.  The court shall consider Defendants' Reply.

B.      *Discriminatory Treatment & Retaliation Claims*

In paragraph 6 of her Amended Complaint, Plaintiff alleges:

> 6.   She has been denied training opportunities; she has been denied
> promotional opportunities; she has been subjected to discriminatory
> treatment including hostile environment discrimination, hostile
> environment sex harassment, quid pro quo sex harassment; and, she
> has been subjected to retaliatory treatment after notifying her
> superiors of the harassment and discriminatory conduct against her.
> Said discriminatory and retaliatory treatment is ongoing.

1.      *Gender Discrimination: Failure to Promote*

Officer Perrell claims she was discriminated against, on the basis of her gender, by

Defendants denying her promotional opportunities.  Officer Perrell presents no direct evidence

of discriminatory denial of promotion based on gender.  The court therefore turns to the burden-

shifting framework outlined in *McDonnell Douglas Corporation. v. Green*, 411 U.S. 792 (1973),

to analyze this claim.  Officer Perrell must establish a *prima facie* case of discriminatory failure

to promote based on her gender by showing (1) she is a member of a protected group; (2) there

was a specific position for which she applied; (3) she was qualified for the position; and (4)

Defendants rejected her application for promotion under circumstances giving rise to an

inference of discrimination.  *Williams v. Giant Food, Inc.*, 370 F.3d 423, 430 (4th Cir. 2004).

In November 2004, Lieutenant Frye informed the WSSC Police Department of his intention to retire.  Lieutenant Frye was the Watershed Patrol Supervisor, when the watershed was a separate unit.  Early in 2005, the WSSC Police Department advertised his position, now titled Police Officer/Supervisor.  The advertisement was in-house, not to the general public.  Defs.' Reply, Ex. 2 (Shook Dep. 31:7 - 32:15).  After receiving applications, Human Resources qualified two applicants for the position:  Officer Perrell and Charles Simmons, a male officer who was the Acting Lieutenant, Officer Perrell's successor in the position.  *Id.*, Ex. 2 (Shook Dep. 32:16 - 20).  Deputy Chief Shook was not involved in the selection process.

Chief Brous selected Deputy Chief Bottjer and Linda Turner, Executive Staff Coordinator at WSSC, as the panel members.  The two applicants, Terri Perrell and Charles Simmons, were interviewed for the Police Officer/Supervisor position.  The panel recommended Charles Simmons.  Based upon the panel's recommendation, Charles Simmons was selected as Police Officer/Supervisor.

Plaintiff argues she was not selected for the position and was discriminated against based on her gender.  It is undisputed that Officer Perrell meets the first three prongs of a *prima facie* case:  (1) as a female, she is a member of a protected group, (2) the WSSC Police Department advertised internally a vacancy for the position of Police Officer/Supervisor which Officer Perrell applied for, and (3) Human Resources determined Officer Perrell was qualified for the position.

Plaintiff claims she meets the fourth prong of a *prima facie* case.  Plaintiff argues she was not given a fair opportunity to compete for the Police Officer/Supervisor position.  Plaintiff contends Officer Simmons was pre-selected for the position.  In November 2004, after

14

Lieutenant Frye announced his retirement, the WSSC Police Department approved Officer

Simmons' order of ten supervisor's shirts, four months before the Police Officer/Supervisor

position was advertised.  Pl.'s Mem., at 18.  Additionally, although Deputy Chief Shook told

Officer Perrell at the time of her removal as Acting Lieutenant that, per WSSC guidelines, she

may not serve in an Acting position more than 90 days, Officer Simmons was allowed to be the

Acting Lieutenant far beyond the 90 day limitation.  *Id.*

Additionally, Plaintiff claims she was groomed to fail.  The description of the advertised

Police Officer/Supervisor position was consistent with the duties pertinent to the defunct

Watershed Patrol Unit.  Plaintiff was ready to demonstrate her knowledge and experience of

manning the watershed.  "Perrell could not know that the position she thought she was applying

for had morphed from the officially-described watershed position to a position known only by

Brous, Shook, Simmons, and the interviewers to be one of supervising the staff of security

guards."  *Id.* at 19.  Based on the advertised position, Plaintiff asserts she was more qualified

than Officer Simmons.  The latter lacked the special skills to work the watershed, *i.e.,* Officer

Simmons was not certified to use all terrain vehicles or boats or to ride horses, nor had he ever

opened tainter gates or handled boating licenses.  *Id.* at 4.

Finally, Plaintiff asserts Chief Brous stacked the interviewing panel.  The panelists were

Deputy Chief Bottjer, Chief Brous' subordinate and Linda Turner, Chief Brous' personal friend.

In their Reply, Defendants do not address Plaintiff's non-selection for the supervisory

position as demonstrative of gender discrimination in violation of the Equal Protection Clause,

but instead with regard to Plaintiff's claim of retaliation.  *See* Defs.' Reply, at 3-7.  This Court

nonetheless will consider Defendants' arguments as a response to Plaintiff's claim of gender

discrimination.

Defendants note the supervisory position was advertised in March 2005 after the initiation of Plaintiff's lawsuit. If Officer Simmons was not qualified for the position, as Plaintiff claims, Human Resources would not have permitted Officer Simmons to apply. *Id.* at 3-4. Defendants contend Officer Simmons was far more qualified than Plaintiff for the supervisory position. Officer Simmons is a retiree of the Baltimore City Police Department. He has been employed as a WSSC police officer for 15 years. During this period Officer Simmons has served as Acting Chief (in Chief Brous' absence) and Acting Deputy Chief (in Deputy Chief Shook's absence). Officer Simmons served as Acting Lieutenant for almost a year, May 2004 to March 2005, when the supervisory position was advertised.

Defendants assert Plaintiff was well aware that the Watershed Patrol Unit no longer existed as a separate unit. This reorganization occurred months before the supervisory position was advertised. "Had Ms. Perrell taken the ordinary course of asking anyone in the chain of command about the job for which she was applying, she could have positioned herself to better compete for the position." *Id.* at 6. Defendants reject Plaintiff's assertion that she was more qualified than Officer Simmons based on her knowledge and experience of the watershed. "The Watershed had been subsumed into the whole of the Sanitary District and there simply was no longer a position of police officer who would open tainter gates, stock the fish ponds and clear the fire roads." *Id.*

Regarding the panelists, Defendants note Deputy Chief Bottjer, an 18 year employee of WSSC, has conducted numerous interviews at WSSC. Ms. Turner has participated in at least five interview panels for various WSSC departments. Contrary to Plaintiff's assertion, Ms.

16

Turner is not a personal friend of Chief Brous.  Ms. Turner and Chief Brous have a mutual friend who has extended invitations to both and they have, separately, attended a party.

Defendants reject Plaintiff's assertion that the ten white (supervisory) shirts ordered by Officer Simmons is indicative that he was pre-selected for the Police Officer/Supervisor position.  As Defendants note, Officer Simmons is the squad quartermaster who is responsible for ordering supplies for uniformed officers.  *See id.*, Ex. 4 (Simmons Dep. 52:15 - 20).

In her Surreply Plaintiff reiterates the vacancy announcement for Police Officer/ Supervisor "plainly indicated that the position required particular experience and knowledge about the watershed, and that the only supervision was for the three on-site guards.  That was the position for which Perrell applied."  Pl.'s Surreply, at 7.  Plaintiff notes "[s]upervisory duties were not made far more extensive until *after* Simmons' selection."  *Id.*  With regard to the white (supervisory) shirts ordered by Officer Simmons, Plaintiff admits Officer Simmons wore white shirts while he was Acting Lieutenant.  "The fact that Brous approved Simmons['] order for ten supervisor's shirts as soon as the position became open, and approximately five months before a candidate was selected is evidence from which a reasonable jury could conclude that Simmons was pre-selected for the position."  *Id.* at 8.  Finally, Plaintiff reasserts that Deputy Chief Shook was involved with the selection of Officer Simmons for the supervisory position.

> Q:   How soon after the interview did you review the responses?
>
> A:   I'm not exactly sure.  Ms. Turner and Mr. Bottjer conducted the interviews.  I believe both interviews were held on the same day, but I don't – – I'm not exactly sure.  They finished their notes.
>
>    They turned those interview answers over to Deputy Chief Shook, who reviewed them, took their recommendation under advisement, made his recommendation to me, reference to who he thought the best candidate for the position was.

I reviewed all the materials and I concurred with his decision.

*Id.*, Ex. BBB (Brous Dep. 42:10 - 43:2).

It is undisputed that WSSC advertised, to its employees only, the vacancy for Police

Officer/Supervisor.  That Vacancy Announcement, No. 05-0087, with a closing date of February

28, 2005, lists *Examples of Work*.

> Provides direct supervision for all Watershed Use Permits including printing, issuing, and accounting of large sums of revenue; Monitors private vending of WSSC Use Permits for accuracy and general compliance with General Accounting; Initiates first response to operate tainter gates, silt, needle and intake tower valves during emergencies; Enforces state laws and Commission watershed regulations through the issuance of citations and through delegated authority to exercise power of arrest; Serves as liaison to three District courts and states attorney offices with reference to watershed related cases; Performs related duties.

Pl.'s Mem., Ex. Q, at 1.

It is further undisputed that, based on the vacancy announcement, Officer Perrell

assumed she had the requisite experience, knowledge and skill to compete for the position.

Nothing in the vacancy announcement forewarned Officer Perrell that the job would require a

significant supervisory background.

> Q:  So did you get the feeling that Ms. Perrell thought that this was a watershed position, as opposed to a supervisory position?
>
> A:  Yes.  Based on her answers.  But I also thought that's where her experience lies.

*Id.*, Ex. P (Turner Dep. 43:18 - 44:1).

> Q:  Did Helmut Bottjer provide the candidates with a summary or an overview of the position that they were applying for?
>
> A:  Yes.  At the beginning.

18

>    Q:   Did he describe it as a supervisory position or as a watershed
>    position?
>
>    A:   Supervisory.

Defs.'s Reply, Ex. 3 (Turner Dep. at 14).

It is undisputed that Officer Perrell knew that the WSSC security force was restructured or reorganized to the WSSC police department.  Defs.' Mem., Ex. 2 (Perrell Dep. 17:4 - 20).  Officer Perrell knew her position was retitled from Watershed Patrol Officer to Police Officer in 2004.  *Id.*, Ex. 2 (Perrell Dep. 7:15: 8:2).  Further, as Officer Perrell testified, "[t]he Watershed Patrol Unit used to be its own specialized unit.  It was separate from the Operations Patrol Section.  So [in March 2004] they just grouped us into one."  *Id.*, Ex. 2 (Perrell Dep. 8:13 - 17); *see id.*, Ex. 2 (Perrell Dep. 77:5 - 9) ("Q:  After [March 2004] there was no more specialized Watershed unit.  Correct? A:  Correct.  Q:  It was simply Sector Two? A:  Yes.").  During his deposition Deputy Chief Shook explained the positions were *retitled* in March 2004, and the information was distributed to the rank and file at the March 2004 meeting when management made changes to the work schedule.  "We did away with the designation of watershed patrol officer and combined everything into police officer, and *changed the watershed patrol supervisor into police officer/supervisor*."  *Id.*, Ex. 4 (Shook Dep. 11:14 - 17) (emphasis added).  Deputy Chief Shook's testimony is verified by the Police Officer/Supervisor description which lists the most recent revision as *March 2004*.  *See* Pl.'s Mem., Ex. Q at 3.

It is undisputed the advertised vacant position was Police Officer/Supervisor, not Watershed Patrol Supervisor.  It is further undisputed that both the vacancy announcement and the detailed agency description of the Police Officer/Supervisor position list *examples of work* that were duties exclusive to the defunct Watershed Patrol Unit.  *See* Pl.'s Mem, Ex. Q.  Despite

these *examples of work*, Officer Perrell knew or should have known the vacant position was ***not*** restricted to the defunct Watershed Patrol Unit.

> Q:  Did you talk to [Deputy] Chief Shook about [any] changes that had taken place to the position?
>
> A:  No.  I was unaware of any changes.  I didn't know.  The only changes that I knew of were in the job description.
>
> Q:  I understand that your testimony is that you were going strictly by the job description.  There is no question that that is clear.  But you are also aware of the reorganization that occurred in March 2004 when you were the acting supervisor.  Correct?
>
> A:  Yes.
>
> Q:   Did you talk to anybody involved in the reorganization with respect to how that would affect this position in order to prepare for the interview?
>
> A:  No.

Defs.' Reply, Ex. 1 (Perrell Dep. 109:1 - 16).

The WSSC Police Department came into existence in October 2003, after being a security force previously.  The transition from a security force to a police department is reflected in the changes to titles and responsibilities.  Many of the duties performed by the defunct Watershed Patrol Unit were ultimately assigned to other departments within WSSC.  Although the police department's positions were retitled in March 2004, it is apparent from the record that job descriptions were not simultaneously revised.

Viewing the evidence in the light most favorable to Plaintiff, the court finds Officer Perrell fails to establish a *prima facie* case because she has not established that Defendants rejected her application for promotion under circumstances giving rise to an inference of discrimination.  The record reveals Officer Simmons has vastly superior experience as a

supervisor compared to Officer Perrell.  "[Officer Simmons] has been in law enforcement for 40

years.  He has held virtually every position in our unit at one time or another."  Defs.' Mem., Ex.

4 (Shook Dep. 117:4 - 6).  Plaintiff admits her supervisory background is limited.  "I have very

limited experience in management.  Before I – – I guess before I started here at WSSC, I

managed in retail.  And that was the extend of my management.  As far as management in police,

it was limited to the time I spent in an acting role."  Defs.' Reply, Ex. 1 (Perrell Dep. 103:12 -

16).  The court rejects Plaintiff's assertions that she was groomed to fail and that she was not

given a fair opportunity to compete for the Police Officer/Supervisor position.

    Finally, Plaintiff alleges she was denied promotional opportuni*ties*.  Plaintiff applied for

the Police Officer/Supervisor position *after* filing an Amended Complaint alleging violations of

federal law.  *See id.*, Ex. 1 (Perrell Dep. 110:10 - 18).  Although there were vacant Investigator

positions and Captain positions, Officer Perrell did not apply for these positions.  *See* Defs.'

Mem., Ex. 2 (Perrell Dep. 111:8 - 112:7).  Plaintiff thus has failed to demonstrate what other

promotional opportunities, besides the Police Officer/Supervisor, that she was qualified for,

applied for, but was denied.

    2.    *Gender Discrimination: Lack of Training Opportunities*

    Officer Perrell claims she was discriminated against, on the basis of her gender, by

Defendants denying her training opportunities to assist her in her career development.  Officer

Perrell presents no direct evidence of discriminatory denial of training based on gender.  The

court therefore turns to the burden-shifting framework outlined in *McDonnell Douglas*, to

analyze this claim.  In order to establish a *prima facie* case, Officer Perrell must show that (1)

she is a member of a protected class; (2) Defendants provided training to their employees; (3)

she was eligible for training; and (4) Defendants did not offer her training under circumstances giving rise to an inference of discrimination. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649-50 (4th Cir. 2002). Officer Perrell admits she has been sent to some training, *see* Pl.'s Mem., at 22, but alleges being denied the type of training that could advance her career.

The career-enhancing training which Officer Perrell sought was a supervisory training class and Field Training Officer ("FTO") School. In either April (according to Officer Perrell) or May (according to Deputy Chief Shook) 2004, Deputy Chief Shook advised Officer Perrell of an upcoming supervisory training class in June 2004.

*Compare* Defs.' Mem., Ex. 2 (Perrell Dep. 89:18 - 90:7):

> Q:   Do you recall ever being given a schedule of upcoming supervisory classes by [Deputy Chief] Shook?
>
> A:  Yes.
>
> Q:  When was that?
>
> A:  It was during my acting role.
>
> Q:  How did that come up?
>
> A:  We were talking, and he said that, if I were to get promoted, that this would certainly ease the promotional process. So it would be a good class and also, police supervisors have to have that training.
>
> Q:  In order to be a police supervisor?
>
> A:  Yes. That you have to have that training.

*with id.*, Ex. 4 (Shook Dep. 25:19 - 26:10):

> A:   I copied a sheet off one of the Maryland Police Training Commission training calendars that had supervisor schools on it for the rest – – the remainder of the year. I made a copy of that.
>
> I brought [Acting Lieutenant Perrell] in. I explained everything

> to her and my reasons [for removing her as Acting Supervisor].  And
> I made it – – I thought I made it clear to her that this change would
> not affect her either ability or chances of being promoted sometime
> in the future, but she needed to obtain some sort of supervisory
> training.  She had limited experience in supervision and had no
> training in supervision.

It is undisputed that Officer Perrell declined to attend the supervisory training class in

June 2004.

*Compare* Defs.' Mem., Ex. 4 (Shook Dep. 26:11 - 18):

> A:  I then pointed out to her that there was a class coming up in June,
> and she said that she either had some commitments or it just wouldn't
> work in June.
>
>  I said, "Fine.  Here's the paper.  There is the stuff for the rest of
> the year.  Let me know which one you want to go to," and that's the
> way we ended it.

*with id.*, Ex. 2 (Perrell Dep. 90:21 - 91:8):

> A:  Originally he asked me if I was interested in doing it.  And I said
> yes.  I believe the original dates that he said – – there was an
> upcoming class, and I thought that the class was like June or
> something like that.
>
>  And I said, well, I would definitely be interested in doing it.  But
> at that time my kids were still in school, and if there was a later date
> class, I thought that would be great.  So he handed me the packet.  He
> said here is [sic] other dates.

Sometime after this meeting Officer Perrell selected a supervisory training class

scheduled for August 2004, highlighted the class and attached a note indicating her interest.

Officer Perrell left the note on Deputy Chief Shook's desk.  Officer Perrell never heard anything

from Deputy Chief Shook about the August class.  She did not inquire about her request nor did

she ever remind Deputy Chief Shook of her interest in attending the August supervisory training

class.  *Id.*, Ex. 2 (Perrell Dep. 94:1 - 18, 98:8 - 99:2).

Deputy Chief Shook denies Officer Perrell subsequently notified him of her interest in

the August supervisory training class.

> Q:   And then you indicated that you gave her the schedule and told
> her to find a class and let you know what she wanted to take?
>
> A:   Yes, ma'am.
>
> Q:   Did she ever come back to you and say, "This is the training I
> want to take"?
>
> A:   No, ma'am.

*Id.*, Ex. 4 (Shook Dep. 95:1 -7).

Officer Perrell did not submit another request to attend a supervisory training class.

> Q:   After the August class apparently didn't pan out, did you ever
> seek to get anymore supervisory training?
>
> A:   If you consider – – well, I did not request for that specific course
> again, if that's what you are asking.  But I did request to attend Field
> Training Officer School.

*Id.*, Ex. 2 (Perrell Dep. 104:3 - 9).

Viewing the evidence in the light most favorable to Plaintiff, the court finds Officer

Perrell expressed an interest in the August supervisory training class by leaving the schedule

with an attached note on Deputy Chief Shook's desk.  It is undisputed that Officer Perrell is a

member of a protected class, that Defendants provide training to their employees and that Officer

Perrell was eligible for supervisory training.  Plaintiff has not demonstrated, however, that the

circumstances of the "denial" of the August supervisory training class give rise to an inference of

gender discrimination.  Plaintiff asserts Defendants used her childcare issues as a basis for

denying her training, a textbook example of discrimination.  Pl.'s Mem., at 21.  "The 'childcare'

issues raised by Defendants are categorically denied by Plaintiff."  Pl.'s Surreply, at 5.  It is

24

Plaintiff, not Defendants, who raises her children's schedule as precluding her from attending the June supervisory training class. *See* Defs.' Mem., Ex. 4 (Shook Dep. 45:12 - 16). It is noteworthy that, although Plaintiff's day shift schedule requires her to report to work at 7:00 a.m., she takes an hour of annual leave in the morning and reports to work at 8:00 a.m., due to child care issues. *See id.*, Ex. 2 (Perrell Dep. 26:18- 21, 218:7 - 14, 221:1 - 22), Ex. 4 (Shook Dep. 105:16 - 108:7, 121:10 - 122:13).

The other career-enhancing training Plaintiff sought, but allegedly Deputy Chief Shook denied, was her February 2005 request to attend FTO School.

> Q:  You said that you were denied [Field Training Officer] training by [Deputy Chief] Shook?
>
> A:  Yes.
>
> Q:  How did that denial happen?
>
> A:  I requested the training through my Captain at the time, Captain Ford. And he stated that he went to Mr. Shook and requested to send me to that training. . . . *My Captain said that he went to Mr. Shook, requested that I be sent to the training, and Mr. Shook glared at him and turned around and walked away.*
>
> Q:  Didn't say anything?
>
> A:  No.
>
> Q:  That's what Captain Ford told you?
>
> A:  Yes. So, essentially, my training was denied.

*Id.*, Ex. 2 (Perrell Dep. 146:21 - 147:6, 147:9 - 17) (emphasis added). Officer Perrell admits that she never spoke directly with Deputy Chief Shook about the FTO training. She further concedes Deputy Chief Shook did not personally deny to her the requested training. *Id.*, Ex. 2 (Perrell Dep. 149:4 - 17). As of August 24, 2005, the date of her deposition, Officer Perrell has not

requested to attend FTO classes since "[t]he last correspondence was with my Captain, that I wasn't allowed to go.  So I certainly wasn't about to ask again." *Id.*, Ex. 2 (Perrell Dep. 153:6 - 8).

Captain Frank Ford confirms receiving Officer Perrell's request.  Captain Ford never submitted Officer Perrell's request to Deputy Chief Shook.

> Q:  Do you recall Terri Perrell ever requesting to go to field training officer school?
>
> A:  Yeah.  She came to me when – – when I sent out that notice, she came to me and said, "I'd like the chance to go to that."
>
> And what I told her, I said, "Terri," I said, "Look, right now let's not go down that road."  I said, "You and I both know what's going to happen."  I said, "Just – – I'll tell you what."  I said, "In April sometime, I will get a hold of somebody and I will send you to the training myself."  I said, "But you know what's going to happen.  Shook didn't bring your name up.  He makes the selections," you know, "Your name wasn't mentioned."
>
> *And I'm not saying that he wouldn't have said yes, because I never went to him and asked him.  I just took it upon myself to say to her – –which I did a lot – – "Don't even go down that road.  Just leave it alone right now*."

*Id.*, Ex. 26 (Ford Dep. 43:4 - 44:2) (emphasis added).

According to Chief Brous, Officer Perrell never approached him and requested to attend FTO School in February 2005.  *Id.*, Ex. 3 (Brous Dep. 132:7 - 10).  Both Chief Brous and Deputy Chief Shook confirm they were unaware of Officer Perrell's request to attend FTO School until after Officer Perrell filed her complaint.  *See id.*, Ex.3 (Brous Dep. 132:11 - 21), Ex. 4 (Shook Dep. 95:15 - 96:7).  Viewing the evidence in the light most favorable to Plaintiff, the court finds Defendants did not deny Officer Perrell FTO training.  Officer Perrell's request to attend FTO School was not submitted to Defendants and thus they took no action on her request.

No inference of gender discrimination against Officer Perrell is suggested based on these circumstances.  Further, the decision to withdraw Officer Beth Thomas from FTO School was made for other considerations[1] and does not support an inference of improper gender discrimination against Officer Perrell.

    *3.*      *Sexual Harassment: Quid Pro Quo*

Officer Perrell alleges she was the victim of *quid pro quo* sexual harassment.  She contends Deputy Chief Shook implicitly sought sexual favors in exchange for sending her to a training class, Street Survival, in Orlando, Florida.

> A:  [Deputy Chief Shook] asked me who I was going to be taking [to the training class in Orlando] and – –
>
> Q:   What did you say?
>
> A:  I said, I don't know.  I don't know who I'm going to take.  Did you have someone who you were going to send with me.
>
> Q:   And he – –
>
> A:   And he said, well, I was signed up for that class.  I said, okay.  And so he said that again.  He asked me who I was going to take to the place.  I said, well, I was thinking of going with my husband and just having him sign up as a spouse to go.
>
>     He pretty much – – at that time the conversation – – he went on just to tell me about the training and about the hotels and that it was nice and whatever.  And that was pretty much it.
>
>              \*    \*    \*
>
> Q:   Did you go to that training?
>
> A:   No, I didn't go to that training.

---

[1] Because she was on light duty and, possibly, because Officer Jonathan Ness, who ran the FTO program, believed her officer survival skills and street skills were not good.  *See* Defs.' Mem., Ex. 4 (Shook Dep. 111:6 - 112:11); Pl.'s Mem., Ex. G (Thomas Dep. 22:10 - 24:2).

Q:  Why not?

A:  I don't know.

* * *

Q:  So the way you left it that day, if I understand it, is you are going to Orlando?

A:  Yes.

Q:  And he is going to Orlando?

A:  Yes.

Q:  And he gave you information on hotels?

A:  Yes.

Q:  And then nothing happened?

A:  Nothing happened.

Q:  You didn't do anything, and he didn't do anything, and you didn't end up going?

A:  Yes.

* * *

Q:  *Where did the allegations come from that he made sexual overtures to you?*

A:  *Because the fact that he asked me who would be going with me.*

Q:  *You understood that to be a sexual overture?*

A:  *I thought that was a little unusual.  I didn't know why it mattered.  I also asked him why was he going to send somebody else with me.*

Q:  *Did he say anything like, if I'm going and if you go, you should go alone so we can be together?*

28

A:   *No, he didn't say that.*

Defs.' Mem., Ex. 2 (Perrell Dep. 129:2 - 17, 130:5 - 8, 131:12 - 132:1, 132:4 - 14) (emphasis added).

"In order to establish a *prima facie* case of *quid pro quo* sexual harassment, Plaintiff must show that: (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) Plaintiff's reaction to the harassment affected tangible aspects of compensation, terms, conditions, or privileges of employment; and (5) the employer knew or should have known of the harassment and took no effective remedial action." *Rachel-Smith v. FTData, Inc.*, 247 F. Supp. 2d 734, 745 (D. Md. 2003). Officer Perrell has satisfied the first element of a *quid pro quo* sexual harassment claim.

Plaintiff argues, "[t]he manner and tone of voice exhibited by Shook when he asked Perrell, 'Who are you taking with you?' led Perrell to believe that Shook was impliedly asking for sexual favoritism." Pl.'s Mem., at 29. Based on Plaintiff's own deposition, the court finds she has failed to establish that she was the subject of unwelcome sexual harassment and also failed to establish the harassment was based upon sex. During her deposition Plaintiff acknowledged that the lack of training in Street Survival does not affect her status as an employee nor her pay, preference in assignments, increase in wages, increase in annual leave, sick leave or health insurance. *See* Defs.' Mem., Ex. 2 (Perrell Dep. 153:13 - 154:13). The court finds Plaintiff also has not established the fourth element of a *quid pro quo* sexual harassment claim. It is noteworthy that, although Plaintiff did not attend the October session, she attended a Street Survival class, for female officers only, in Orlando in November, accompanied by her husband. *See id.*, Ex. 2 (Perrell Dep. 137:1 - 10); Ex. 4 (Shook Dep. 104:21 - 105:15). Further

Plaintiff has not established the fifth element.

Deputy Chief Shook explains why he asked Officer Perrell if someone would accompany her.

> A:  The reason that I asked Terri anything about who was going with her, it was my understanding she had never done any overnight travel.  And the rules and regulations for overnight travel are completely different than they are locally.
>
> I told her – – I said, "If you decide you want to fly down, the commission will pay for your ticket, but you will have to pay for your husband and the kids.  If you decide to drive, they will pay for the gas, plus give you mileage."  That was my only reason for even asking who was going with her, because I wanted her to understand and I didn't want there to be any misunderstanding on her part about the travel arrangements.

*Id.*, Ex. 4 (Shook Dep. 86:5 - 19).  Although the court quotes Deputy Chief Shook's testimony, the court is not weighing the evidence nor making a credibility determination.  *Reeves*, 530 U.S. at 150.  Viewing the evidence in the light most favorable to Plaintiff, the court finds Plaintiff has not demonstrated a *prima facie* case of *quid pro quo* sexual harassment.

### 4. *Sexual Harassment: Hostile Work Environment*

"In order to establish a *prima facie* case of hostile work environment sexual harassment, Plaintiff must show: (1) that she was subjected to unwelcome conduct; (2) the unwelcome conduct was based on sex; (3) it was sufficiently pervasive or severe to alter the conditions of employment and to create a hostile work environment; and (4) some basis exists for imputing liability to the employer."  *Rachel-Smith*, 247 F. Supp. 2d at 749.  Plaintiff claims the placement of an inflatable doll in the office and the use of derogatory language to describe or refer to her created a hostile work environment.

### A.   Inflatable Doll

It is undisputed, that on one occasion in November 2004, an inflatable doll, blonde without clothes, appeared in the office.  Although no one knows for certain who was responsible for bringing the inflatable doll to the job site, there seems to be a consensus that the doll was placed in the office on the occasion of Deputy Chief Shook's birthday.  *See* Defs.' Mem., Ex. 2 (Perrell Dep. 259:4 - 21), Ex. 4 (Shook Dep. 61:1 - 18), Ex. 6 (Pitts Dep. 16:9 - 21, 37:7 - 11), Ex. 29 (Thomas Dep. 16:12 - 18).

Plaintiff assumes the inflatable doll was "a tasteless representation of her", Pl.'s Mem., at 27, because the inflatable doll is blonde and generally the same size as Plaintiff.  Defs.' Mem., Ex. 2 (Perrell Dep. 258:1 - 4).

> Q:    And [the inflatable doll] is sitting outside [Deputy Chief] Shook's office, yet you think it is directed at you?
>
> A:  Yes.
>
> Q:  And based on the fact that its hair is blond[e]?
>
> A:  Yes.
>
> Q:  Or painted yellow?
>
> A:  Yes.
>
> Q:  And no other reason?
>
> A:  No.

*Id.*, Ex. 2 (Perrell Dep. 258:17 - 259:3).

When Officer Pitts observed the inflatable doll in the office, he found this unusual. Officer Pitts subsequently had a conversation with Officer Perrell about the inflatable doll. Officer Pitts told Officer Perrell he first thought of her when he saw the doll.  Officer Pitts denies

being told that the doll was meant to represent Officer Perrell.  *Id.*, Ex. 6 (Pitts Dep. 37:12 - 14.

39:10 - 13).  Officer Pitts does not recall Officer Perrell telling him that she believed the doll was

meant to represent her.  *Id.*, Ex. 6 (Pitts Dep. 39:7 - 9).

> Q:  Did you ever hear in the rumor mill that they got the doll because
> it looked like Terri Perrell?
>
> A:  No.
>
> Q:  Did you ever hear from anyone that they brought the doll there
> because of Terri Perrell?
>
> A:  No.
>
> Q:  You were offended by the doll; correct?
>
> A:   I don't know if I was offended.  I just thought it was
> inappropriate in the work place.  That's all.

*Id.*, Ex. 6 (Pitts Dep. 44:6 - 16).

Officer Perrell observed the inflatable doll in the office for 15 to 20 minutes between

8:00 -  8:20 a.m.  When Officer Perrell returned after completing her shift between 2:30 - 2:45

p.m., the doll was no longer visible.  *Id.*, Ex. 2 (Perrell Dep. 255:12 - 256:1).  Officer Thomas,

another female member of the WSSC Police Department, confirms this fact.

> Q:  What happened to the doll?
>
> A:  I think it got deflated and put away.
>
> Q:  How do you know that?
>
> A:  Because it wasn't there anymore, but – –
>
> Q:  Did you see anyone deflate it?
>
> A:  No.

*   *   *

Q:  Did you ever see a picture of the doll?

A:  Yes.

Q:  When did you see that?

A:  It was – – it was done as like a birthday prank, I believe.  And they had like the little pictures posted of the doll, and that's when there was a picture of it, but it wasn't – – I mean, that was the only picture.  Nothing that stayed up like on a wall or anything, but there were – – I think everyone kind of got like a picture of it to hand to somebody every hour was the deal.

*Id.*, Ex. 29 (Thomas Dep. 11:2 - 7, 11 - 21).  According to Officer Thomas, no one thought the inflatable doll was inappropriate in the office because it was a joke.  Officer Thomas does not recall any supervisors telling her that the inflatable doll was inappropriate.  *Id.*, Ex. 29 (Thomas Dep. 19:2 -3, 10 - 12).

According to Captain Ford, he heard that the inflatable doll was sitting at a little conference table near Deputy Chief Shook.  Captain Ford heard some people insinuate that the doll may represent Officer Perrell.  It was Captain Ford's understanding that Deputy Chief Shook placed the doll in his office.  Pl.'s Mem., Ex. K (Ford Dep. 63:1 - 21).

Officer Jonathan Ness does not recall seeing the inflatable doll but recalls seeing photographs of the doll.  He has not seen an inflatable doll in the offices since this particular incident.  *Id.*, Ex. W (Ness Dep. 40:3 - 18).

Viewing the evidence in the light most favorable to Plaintiff, the court finds Officer Perrell has not established a *prima facie* case of a hostile work environment sexual harassment claim.  "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 23 (1993).  Neither side disputes that the inflatable doll was displayed in the office on *one occasion*.  There is contradictory evidence regarding the purpose for placing the doll in the office:  a birthday prank directed at Deputy Chief Shook or Deputy Chief Shook placed the doll in the office himself as "some type of joke they were playing and [Deputy Chief Shook] was the main figurehead of the joke."  Pl.'s Mem., Ex. K (Ford Dep. 63:19 - 21). Plaintiff however has not demonstrated that she was subjected to unwelcome conduct as a result of the inflatable doll being displayed near Deputy Chief Shook's desk.  Officer Pitts testified that no one told him the inflatable doll represented Officer Perrell.  Further, Plaintiff presents no evidence to support the third element, that the inflatable doll was sufficiently pervasive or severe to alter Plaintiff's conditions of employment and to create a hostile work environment.  "[T]o be actionable under Title VII, a sexually objectionable environment must be both objectively and subjectively offensive – i.e., one that a reasonable person would find hostile or abusive and one that the plaintiff found to be so."  *Rachel-Smith*, 247 F. Supp. 2d at 749 (citing *Harris*, 510 U.S. at 21-22).  Officer Perrell observed the inflatable doll, *once*, for a maximum of twenty minutes. As Officer Thomas testified, photographs of the doll were not posted on the wall.  And, according to Officer Thomas, the doll "wasn't graphic, in that it didn't have like nipples or anything like that."  Defs.' Mem., Ex. 29 (Thomas Dep. 10:1 - 2).  "[C]onduct must be extreme to amount to a change in the terms and conditions of employment[.]"  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  The court finds the inflatable doll was inappropriate in the work setting, but was not sufficiently severe or pervasive to create a hostile work environment or

alter Plaintiff's conditions of employment.

### B.  Derogatory Language

Plaintiff contends the use of derogatory language directed at her and used to describe her also created a hostile work environment.  "The nasty language directed at her was pervasive and permeated the workplace so as to materially affect her working conditions.  The conduct was specifically designed to cause Perrell to be a pariah in the workplace."  Pl.'s Mem., at 28.

Officer Perrell takes offense to being called "Twinkle Toes."  When Officer Perrell called Deputy Chief Shook on one occasion, he responded, "what's up Twinkle Toes?"

> Q:  Is [Twinkle Toes] an offensive term to you?
>
> A:  I think so.
>
> Q:  What does it mean to you?
>
> A:  I think it means that you are either – – you are like light on your toes.  You can't hang with the heavy weights, like that sort of thing.  You couldn't like – – you don't measure up, so to say.
>
> Q:  Have you ever heard anyone else use that term in that context?
>
> A:  No.
>
> Q:  Other than that one time, has [Deputy Chief Shook] every used that term before, or since?
>
> A:  No.
>
> Q:   Do you think that the term Twinkle Toes can apply to men or only women?
>
> A:  I don't know.

Defs.' Mem., Ex. 2 (Perrell Dep. 245:6 - 21).

Officer Pitts recalls Deputy Chief Shook calling Officer Perrell "Twinkle Toes" on an

occasion but cannot recall the context.  Officer Pitts does not necessarily consider the term a derogatory comment and cannot define what it means.  *Id.*, Ex. 6 (Pitts Dep. 33:1 - 19).  The term "Twinkle Toes" does not mean anything to Chief Brous and the meaning would depend on the context in which it is used.  *Id.*, Ex. 3 (Brous Dep. 146:4 - 7).

Plaintiff also takes offense to having her associates labeled as "shit stirrers."

Q:  Male colleagues who speak to you have been called Shit Stirrers?

A:  Yes.

*   *   *

Q:  And did you hear them being called that?

A:  Yes.

Q:  By [Deputy] Chief Shook?

A:  Yes.

Q:  How many times?

A:  One time.

Q:  In what context?

A:  During my performance evaluation.

Q:  What was said?

A:  He pretty much told me that I needed to stay away from the Shit Stirrers.

Q:  What do you think that means, in your mind?

A:  I think that means – –

Q:  No.  The term.  What do you think the term means?

A:  Shit Stirrers?  People that cause problems.

Q:  *How was that discriminatory against you?*

A:  *I believe it is discriminatory because they are telling me who I can and can't hang around with.*

Q:  And they don't tell men whom they can and cannot hang around with.  Is that your allegation?

A:  I don't know if they do or not.

*Id.*, Ex. 2 (Perrell Dep. 243:15 - 17, 22 - 244:21) (emphasis added).

Officer Pitts recalls Deputy Chief Shook calling Officer Perrell a "shit stirrer" while Officer Perrell was the acting watershed patrol supervisor.  Deputy Chief Shook made the remark during the latter part of her assignment, commenting that he had to get her out of the position.  *Id.*, Ex. 6 (Pitts Dep. 8:19 - 9:9).  Chief Brous does not consider the term "shit stirrer" a sexist term.  To Chief Brous the term "shit stirrer" means problematic, troublemaker.  *Id.*, Ex. 3 (Brous Dep. 145:20 - 146:3).

For several years, Officer Perrell was the only female member of the WSSC security force.  She called herself "Princess."  When Officer Thomas joined the force, Officer Perrell referred to herself as "Barbie" and Officer Thomas as "Skipper."  These nicknames are derived from dolls.  "Barbie" is blonde like Officer Perrell and "Skipper" is a red-head like Officer Thomas.  Officer Perrell does not find the nicknames "Princess" or "Barbie" offensive.  Officer Perrell has been called "Barbie" and "Princess" many times and is not offended.  *See id.*, Ex. 2 (Perrell Dep. 245:22 - 247:10).

Chief Brous recalls Officer Perrell referring to herself as "Princess" when he was contemplating hiring Officer Thomas.  Officer Perrell asked Chief Brous, jokingly he believes, not to hire another female officer because she is the only "Princess" in the WSSC Police

Department.  Chief Brous also corroborates that Officer Perrell and Officer Thomas have referred to themselves as "Barbie" and "Skipper."  *Id.*, Ex. 3 (Brous De. 146:8 - 147:21).

Viewing the evidence in the light most favorable to Plaintiff, the court finds Plaintiff has not demonstrated that the "derogatory language" used to refer to her or her associates establishes a *prima facie* case of hostile work environment sexual discrimination.  Officer Perrell herself concedes that the "offensive" terms "Twinkle Toes" and "Shit Stirrers" are *performance-based* terms, not *gender-based* terms.  Thus, she cannot satisfy the second element that the unwelcome conduct was based on sex.  Deputy Chief Shook used the terms "Twinkle Toes" and "Shit Stirrers" on one occasion, during different conversations, when speaking with Officer Perrell. Officer Pitts testified that Deputy Chief Shook referred to Officer Perrell on one occasion each as "Twinkle Toes" and "Shit Stirrer."  Plaintiff fails to demonstrate that the four times Deputy Chief Shook used these two terms are sufficiently pervasive or severe to alter her conditions of employment and to create a hostile work environment.  "'[M]ere utterance of an . . . epithet which engenders offensive feelings in an employee' would not affect the conditions of employment to sufficiently significant degree to violate Title VII[.]"  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971)). It is noteworthy that the only *gender-based* terms used to describe Officer Perrell are nicknames she selected and thus which are not offensive to her.

     *5.*    *Retaliation*

Since the parties filed their briefs, the United States Supreme Court has issued an opinion defining the scope of the anti-retaliation provision of Title VII of the Civil Rights Act of 1964. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. ___, 126 S. Ct. 2405 (2006).  "[T]he

anti-retaliation provision . . . is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 2412-13. "The scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Id.* at 2414. Thus, in establishing a *prima facie* case, a plaintiff is no longer restricted to demonstrating that an employer took an adverse *employment* action against her. The anti-retaliation provision protects an individual from retaliation that produces a harm or injury. "[T]he provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2409. Therefore, the Fourth Circuit opinion in *Von Gunten v. Maryland*, 243 F.3d 858, 866 (4th Cir. 2001), which limited the application of the anti-retaliation provision to the terms, conditions and benefits of employment, has been abrogated.

Under *White*, to establish a *prima facie* case of retaliation, Plaintiff must demonstrate that (1) she engaged in protected activity; (2) Defendants took an action or actions that a reasonable employee would find materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action or actions. Under the burden-shifting framework of *McDonnell Douglas*, if Plaintiff meets her initial burden of establishing a *prima facie* case of retaliation, the burden then shifts to Defendants, who must articulate a legitimate, non-retaliatory justification for the materially adverse action. If Defendants satisfy their burden, then Plaintiff must demonstrate that Defendants' non-retaliatory reason is a mere pretext. *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005), *cert. denied.*, No. 05-981, 2006 U.S. LEXIS 2529 (Mar. 27, 2006) (modifying elements to harmonize with *White*).

By definition, if the alleged materially adverse action occurred *before* Plaintiff engaged in protected activity, the alleged materially adverse action cannot be classified as *retaliation*. *See Nichols v. Comcast Cablevision of Md.*, 84 F. Supp. 2d 642, 657-58 n.21 (D. Md.), *aff'd*, 217 F.3d 840 (4th Cir. 2000).

> Q:   What is [this]?
>
> A:   It is a copy of a complaint letter that was sent from my attorney, Mary Ann Ryan, to Acting Lieutenant Simmons.
>
> Q:   What is the date on that letter?
>
> A:   November the 16th, 2004.
>
> Q:   Now, prior to that letter, had you personally ever submitted any written complaints of discrimination to anyone here at WSSC?
>
> A:   No.
>
> Q:   How about verbal complaints?
>
> A:   No.
>
> Q:   Any verbal complaints of sexual harassment?
>
> A:   No.
>
> Q:   Gender discrimination?
>
> A:   No.

Defs.' Mem., Ex. 2 (Perrell Dep. 34:3 - 18).  *See id.*, Ex. 2 (Perrell Dep. 53:12 - 15, 75:2 - 5).

Plaintiff claims she made verbal complaints to Carla Joyner, Acting General Manager of WSSC *before* November 16, 2004.  *See* Pl.'s Mem., Ex. A (Perrell Aff. ¶ 28).  "At deposition, Perrell stated that she talked to Carla Joyner about training issues.  She was never asked about discrimination with respect to training."  Pl.'s Surreply, at 11.  At her deposition Officer Perrell

was asked specifically whether she submitted any written complaints or made any verbal complaints *before* November 16, 2004.  Officer Perrell answered no.  Although Plaintiff now argues she was not specifically asked about discrimination with respect to training, Plaintiff was asked if she made any verbal complaints of discrimination.  Any verbal complaints would encompass verbal complaints to Ms. Joyner regarding the lack of training.  Based on Plaintiff's deposition testimony, the court will only consider any alleged materially adverse action *after* November 16, 2004.

Plaintiff identifies five instances of ongoing retaliation.  They are "the failure to investigate or discipline with respect to the blow-up doll; the unfair promotional process; the unfair discipline; the defamatory comments about her; and the bogus investigations and surveillances."  *Id.* at 12.  The court will first addressed the inflatable doll, promotional process and defamatory comments since these instances are also raised as gender discrimination or sexual harassment claims under the Equal Protection Clause.

Plaintiff claims Defendants' failure to investigate or discipline with respect to the inflatable doll[2] is in retaliation to her November 16, 2004 EEO complaint.  As discussed *supra*, Plaintiff did not demonstrate *any* nexus between her and the inflatable doll.  There is no evidence the inflatable doll was meant or intended to represent Plaintiff.  To the contrary, the evidence reveals the inflatable doll was brought to the office as a practical joke to celebrate Deputy Chief Shook's birthday or that Deputy Chief Shook placed the doll in the office himself as some type of joke.

---

[2] In her affidavit, Plaintiff states she observed the inflatable doll on or about *November 11, 2004*, which predates Plaintiff's protected activity on November 16, 2004.  *See* Pl.'s Mem., Ex. A (Perrell Aff. ¶ 40).  Since Plaintiff alleges retaliation based on the failure to investigate or discipline with respect to the inflatable doll, the court assumes this inaction occurred after November 16, 2004.

When Deputy Chief Shook noticed the inflatable doll, he initially moved it to his cubicle. He subsequently deflated the doll and placed it in the storage room.  As he saw officers throughout the day he would tell them, "enough of this" and "I don't want to see this stuff anymore."  Defs.' Mem., Ex. 4 (Shook Dep. 55:1 - 56: 8).

> Q:  Did you make any effort to find out who had participated in these high jinks [of placing the inflatable doll in office]?
>
> A:  I made some general inquiries, nothing specific, and I never got any feedback.  I mean, I had hoped that that had taken care of the problem, and it hasn't occurred since, so obviously it has.

*Id.*, Ex. 4 (Shook Dep. 61:19 - 62:3).

Deputy Chief Shook did make inquiries about the inflatable doll.  He concedes that the inquiries were general, not specific, and thus questions can be raised about the thoroughness of the investigation.  Officer George Stecklein was unaware of any investigation.  "As far as I know, there was no investigation about the doll.  No supervisor ever questioned me about it, nor did I ever hear any supervisor say that placing the doll in the police office was inappropriate."  Pl.'s Mem., Ex. H (Stecklein Aff. ¶ 13).  Similarly, Officer Thomas denies being told by anyone in a supervisory position that the inflatable doll was inappropriate.  Defs.' Mem., Ex. 29 (Thomas Dep. 19:10 - 12).  Deputy Chief Shook admits he did not speak with every officer about the inflatable doll.  *Id.*, Ex. 4 (Shook Dep. 56:3 - 8).

It is not disputed however that the incident was not repeated.  Plaintiff has failed to demonstrate the harm or injury she suffered was materially adverse.  Though the display of this doll in a work setting is clearly inappropriate, the harm to Plaintiff is appropriately categorized as trivial.  *White*, 126 S. Ct. at 2415.

Next, Plaintiff claims the unfair promotional process demonstrates ongoing retaliation by

Defendants.  The court has already discussed at length Plaintiff's failure to promote gender

discrimination claim.  *See supra*.  Plaintiff applied for a supervisory position; she was one of two

candidates selected to compete for the position.  Plaintiff readily concedes her supervisory

experience is limited to her 90 days as the Acting Lieutenant of the Watershed Patrol Unit.  The

record shows her competitor was vastly superior in his experience as a supervisor, including

Acting Deputy Chief and Acting Chief at WSSC.  "The mere fact that plaintiff had filed [a] . . .

complaint does not, in and of itself, create a reasonable inference that everything that happened

after that point, which plaintiff did not like, was caused by the fact that [s]he had filed h[er]

complaint."  *Chappell v. School Bd. of City of Virginia Beach*, 12 F. Supp. 2d 509, 517 (E.D. Va.

1998).  Plaintiff fails to demonstrate her non-selection constitutes ongoing retaliation.

Third, Plaintiff alleges she was the subject of defamatory comments.  Deputy Chief

Shook referred to her once as "Twinkle Toes."  During a performance evaluation, Deputy Chief

Shook referred to some of Plaintiff's male colleagues as "Shit Stirrer."  Officer Pitts recalls

Deputy Chief Shook on one occasion referred to Officer Perrell as "Twinkle Toes" and on a

separate occasion referred to Officer Perrell as "Shit Stirrer."  Plaintiff conceded that these

derogatory comments are *performance-based* rather than *gender-based*.  "[I]t is important to

separate significant from trivial harms.  Title VII . . . does not set forth 'a general civility code

for the American workplace.'"  *White*, 126 S. Ct. at 2415 (quoting *Oncale v. Sundowner

Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)).  Plaintiff has not demonstrated retaliation.

Fourth, Plaintiff claims she was unfairly disciplined in retaliation for filing her November

16, 2004 EEO complaint.  Examples include being charged with AWOL and insubordination and

docked a day's pay for attending a deposition; receiving written counseling for returning to

headquarters too early; receiving written counseling for using abbreviations on her run sheets; and being counseled for being out of her sector. Pl.'s Mem., at 15. Concerning the verbal and written counseling, "[n]o rules, regulations or orders were in place at the time of these alleged violations to give Perrell notice that she was doing anything incorrectly. . . . At all times, she was engaging in conduct that had been approved in the past, and that was often approved when done by other officers." *Id.* at 15-16.

Regarding the "discipline" for attending a deposition, the record shows Officer Simmons had a conversation with Officer Perrell where he apparently provided her erroneous information. In an August 12, 2005 e-mail message, he informed Officer Perrell that she must submit leave requests to attend depositions on August 17 and 19, 2005. Officer Perrell read the e-mail message on August 13, 2005 at 7:44 a.m. Defs.' Reply, Ex. 10 (Simmons Aff., Attach. 2). In her Opposition Plaintiff acknowledges that "[s]he intended to and did fill in her leave request when she *returned to work*." Pl.'s Mem., at 15 (emphasis added). Plaintiff did not submit her leave request *before* attending the deposition. Although Plaintiff claims Officer Simmons did not advise her to resubmit her leave request, Pl.'s Surreply, at 9, the August 12, 2005 e-mail message from Officer Simmons to Officer Perrell provides clear instructions. The court finds Defendants did not dock Plaintiff's pay for insubordination as retaliation for Plaintiff's November 16, 2004 EEO complaint.

Plaintiff contends she was "disciplined" unfairly for matters that in the past had been approved when done by other officers. Captain Ford substantiates Plaintiff's assertion that she was counseled for using abbreviations on run sheets. Pl.'s Mem., Ex. K (Ford Dep. 33:5 - 34:11). Plaintiff submitted as attachments the run sheets of two male officers. *See id.*, Ex. BB.

The court notes there are abbreviations on these run sheets.  According to Captain Ford, Deputy

Chief Shook instructed him to "[t]ell her that from now on, only police entries are to be placed

on [the run sheet]."  *Id.*, Ex. K (Ford Dep. 33:19 - 21).  Captain Ford also verifies that Deputy

Chief Shook implemented a new policy after finding fault with Officer Perrell's run sheets.

"And then later [Deputy Chief Shook] came out and did an order and said that from now on, only

police acronyms or police information could be placed on the sheets."  *Id.*, Ex. K (Ford Dep.

34:2 - 5).  The court cannot discern whether the abbreviations used by the two male officers are

police entries or not.  Also unknown to the court is the date Deputy Chief Shook prepared the

order instructing officers to use only police acronyms or police information on run sheets.  Even

if this new policy was applied first to Officer Perrell, Deputy Chief Shook prepared an order

directed to *all* officers.  Plaintiff has not demonstrated the counseling was in retaliation for her

November 16, 2004 complaint.

Plaintiff also argues she was counseled for returning to headquarters too early and for

being out of her sector.  It is not an unreasonable requirement in law enforcement to have

officers patrol their sector for a specific duration and to patrol only their assigned sector.  *See*

Pl.'s Mem., Ex. W (Ness Dep. 36:6 - 12) ("Q:   And with respect to your sector, what

instructions have you been given about remaining in your sector during your shift?  A:   That you

are to remain in the sector for your shift, unless you have to exit that sector to backup another

member of the department or for an emergency call.").  Although Officer Ness has never been

disciplined or counseled for returning early to WSSC headquarters, *see id.*, Ex. W (Ness Dep.

31:7 - 12), Plaintiff acknowledges that a male officer who returned early to headquarters with her

was also counseled.  *See id.*, Ex. A (Perrell Aff. ¶ 73).  Plaintiff has not demonstrated she was

disciplined unfairly due to her November 16, 2004 EEO complaint.

Finally, Plaintiff claims she was the subject of bogus investigations and surveillances.

Captain Ford was Plaintiff's supervisor from October 2004 to February 2005. *Id.*, Ex. A (Perrell

Aff. ¶¶ 34, 62). Captain Ford substantiates Plaintiff's claim that she was the subject of

surveillances.

> Q:   Were you ever given any assignment to, say, follow Terri Perrell?
>
> A:  Yes.
>
> Q:  And what were you told about that?
>
> A:  [Captain] Milligan called me early on, when I first started [at WSSC], and said that [Deputy Chief] Shook wanted us to follow Perrell, do surveillance one night to see what she was doing. And that was in response to, you know, her not doing her job, which I had no problem with. I mean, if a person is not doing their job – – I've done it before in the State Police, and that's fine.
>
> But I did it. We did it. I know at least one night. I can't think if I did it two nights or not. But I know I did it one night and there was no evidence that she wasn't doing her job.
>
> *       *       *
>
> You know, we had been told that she might take her truck home, which she was not allowed to do anymore, that she may be at her mother's house, maybe shopping, getting her hair done.
>
> But, again, we rode around her house several times that night and she was working.
>
> Q:  Okay. Who was it that asked you? Did anyone else, besides Deputy Chief Shook, ask you to follow her?
>
> A:  No. Milligan called me the next day. We both reported to Deputy Chief Shook.

*Id.*, Ex. K (Ford Dep. 29:20 - 30:15, 31:2 - 12). Apparently, the impetus for the surveillance was

46

what another officer reported to Deputy Chief Shook.

> Q:  – – Rimkavisch had said something to you about Terri Perrell's use of a WSSC vehicle to drive her mother around.  Exactly, or to the best of your recollection, what – – what did he say?
>
> A:  That [Deputy Chief] Shook had been approached by someone at a convention – – a police convention or some police function – –  in Ocean City and had volunteered this information.

*Id.*, Ex. S (Brooks Dep. 35:12 - 19).

Captain Ford also confirms that he had to investigate whether Officer Perrell willfully

failed to participate in a practical exercise during training.  Captain Ford presumes another

officer in the training session told management about Perrell's non-participation.

> A:  But their concern expressed to me was the fact that during in-service training in 2004, November, that she was – – apparently there was an asp baton training or something and she didn't participate in the practical part of the exercise.
>
> So it was a long discussion about what should be done.  And I – – I said, "What's the problem here?  If she's not fit for duty – – let's get her evaluated.  If the doctor says she's not fit, then she can't work."
>
> But I was told to talk to her, get her side of the story, get Muhamod's side of the story.  Muhamod was the instructor from Prince George's County.  I'd probably catch her in a lie and *then they can charge her and fire her.*

*Id.*, Ex. K (Ford Dep. 25:17 - 26:10) (emphasis added).

Later during his deposition Captain Ford discloses he spoke with Chief Brous at least

twice about obtaining a statement from Muhamod.

> A:  The first – – as I testified earlier, the first conversation that we had about [Perrell's non-participation] was at a meeting.  And they wanted me to get Perrell's statement.  They wanted somebody, because they never said who, to get Perrell's statement and to get Muhamod's statement and see if Perrell's lying and *then she could be*

> *charged for falsifying her statement*.

*Id.*, Ex. K (Ford 150:14 - 21) (emphasis added).

Captain Ford spoke with Officer Perrell about her non-participation and then spoke with the instructor.  The instructor verified that Officer Perrell did not have to participate in the practical exercise due to her injury.

When Captain Ford began working at WSSC, Deputy Chief Shook, his supervisor, provided him information about certain officers, including Officer Perrell.

> A:  I was told that Perrell couldn't be trusted.  She was a liar.  She would twist facts around.  Just overall she was – – she was a loner, didn't want to – – didn't want to be a team player.  Just – – you know, she was a negative force there at WSSC.

*Id.*, Ex. K (Ford Dep. 23:2 - 7).

The record also reveals that Officer Perrell was ostracized at work.  New recruits were told to stay away from certain officers who had negative attitudes.  Officer Jill Houser disclosed that she and other recruits were told to stay away from Officer Perrell because she filed a lawsuit against WSSC.  *Id.*, Ex. Y (Interview of Jill Houser at 2, 4, 7).  Officer Houser noticed none of her fellow police officers talked with or acknowledged Officer Perrell.  *Id.*, Ex. Y (Interview of Jill Houser at 7-8, 10).

The surveillance of Officer Perrell and the investigation of her non-participation in a training course were initiated based on the reports of fellow officers.  Officer Perrell may have been under a microscope after her alleged false statement to Chief Brous on June 30, 2004 or after filing her November 16, 2004 EEO complaint.  Management may have been trying to "build a record" to fire her.  The alleged misuse of government property and the failure to participate in relevant career training however are legitimate, nondiscriminatory reasons for

48

Defendants' surveillance and investigation.  "Ms. Perrell points to no adverse action with respect

to her claim[] regarding . . . the surveillance allegedly ordered by her chain of command."  Defs.'

Reply, at 9.

According to Officer Houser, Officer Simmons and Officer Ness warned new recruits to

avoid officers with negative attitudes, though neither identified Officer Perrell directly.  Rumors

circulated that Officer Perrell should be avoided because she filed a lawsuit against WSSC.  In

this instance Plaintiff has established a causal connection between her protected activity, *i.e.*,

filing a lawsuit and an "adverse" action.  The comments do not however constitute material

adversity but is more akin to trivial harms.  *White*, 126 S. Ct. at 2415.  While the court does not

condone how fellow WSSC officers treated Officer Perrell, such snubs and unjust

characterizations do not equate to retaliatory conduct.  *Miller v. Aluminum Co. of America*, 679

F. Supp. 495, 502 (W.D. Pa.), *aff'd*, 856 F.2d 184 (3d Cir. 1988).

C.       *42 U.S.C. § 1983 Claim*

In paragraphs 7 through 10 of her Amended Complaint, Plaintiff alleges:

> 7.   Said discriminatory treatment and retaliation was and is carried
> out by each of the Defendants in this case, under color of state law.
>
> 8.    Plaintiff Perrell was subjected to said discriminatory and
> retaliatory treatment by Defendants Christopher Brous and Howard
> Shook in reckless disregard of her civil rights, both of whom acted
> with actual malice and not in good faith.
>
> 9.  At all relevant times, Christopher Brous and Howard Shook were
> acting within the scope of their employment with Defendant WSSC
> and the WSSC Police Department.
>
> 10.   It was and is the policy, practice and custom of Defendant
> WSSC to subject Plaintiff Perrell to sex discrimination and retaliatory
> treatment, as evidenced by the execution of one or more
> governmental act(s) and/or edict(s) by those who represent official

policy within WSSC.

Under the Equal Protection Clause gender discrimination is prohibited unless the discriminatory means employed are substantially related to the achievement of important governmental objectives. *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). "[I]ntentional sexual harassment of employees by persons acting under color of state law violates the Fourteenth Amendment and is actionable under § 1983." *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994). The standards developed in Title VII litigation applies to similar cases under 42 U.S.C. § 1983. *Id.*

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell v. Department of Social Servs.* 436 U.S. 658, 694 (1978). Plaintiff has not presented *any* evidence of a WSSC policy or custom permitting or encouraging its supervisors to sexually harass employees. "In order to establish liability against a municipal entity under Section 1983, a plaintiff must show at the very least that his injury was the result of a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law." *McCoy v. Macon Water Auth.*, 966 F. Supp. 1209, 1222 (M.D. Ga. 1997).

"Plaintiff alleges that the persons committing the discriminatory and retaliatory conduct were the Chief of Police and the Deputy Chief. A police chief's conduct may impose liability even if he does not have complete authority as a policy maker." Pl.'s Mem., at 30. Plaintiff contends Chief Brous appears to have complete authority as a policy maker but, even if he does not, WSSC knowingly acquiesced in Chief Brous' conduct and decision. Plaintiff further

contends Chief Brous is an official of such rank that his actions and decisions can be deemed to be done on behalf of WSSC.  The WSSC Commissioners, therefore have ratified all the discriminatory and retaliatory acts against Officer Perrell.  The court finds Plaintiff's bare allegations are insufficient under *Monell* "because a municipality cannot be held liable under § 1983 on a respondent superior theory[.]"  *Wilder v. Southeastern Public Serv. Auth.*, 869 F. Supp. 409, 417 (E.D. Va. 1994), *aff'd*, 69 F.3d 534 (4th Cir. 1995).

Next, Plaintiff asserts any qualified immunity shielding Chief Brous and Deputy Chief Shook is destroyed because these public officials acted with malice or disregard to Plaintiff's civil rights.  "Captain Ford has given a credible account of how Brous and Shook actively and intentionally targeted Perrell for the purpose of trying to cause her to lose her job and to create an exceedingly hostile environment."  Pl.'s Mem., at 31.  In their Reply, regarding another matter, Defendants have a less charitable view of Captain Ford.  "Mr. Ford's testimony should be viewed with skepticism.  Mr. Ford had personal animosity towards Mr. Shook in particular and ended up resigning . . . just before he was fired."  Defs.' Reply, at 14.  The court may not weigh evidence or make credibility determinations.  *Reeves*, 530 U.S. at 150.  The court has already addressed one instance where Captain Ford confirmed he had Officer Perrell under surveillance as directed by Deputy Chief Shook.  The court noted this surveillance apparently occurred as a result of a fellow officer reportedly seeing Officer Perrell driving her mother around in a WSSC vehicle.  Verifying whether an employee is misusing government property is a legitimate, nondiscriminatory reason for a surveillance.  Further, the record clearly shows some mistrust of Officer Perrell after, as she acknowledges, did not tell Chief Brous "the whole story" regarding her assertion that Deputy Chief Shook gave her no reason for her removal as Acting

Lieutenant of the Watershed Patrol Unit.  *See* Defs.' Mem., Ex. 2 (Perrell Dep. 184:12 - 20).

Although the subsequent internal investigation did not substantiate that Officer Perrell made a

false statement, Chief Brous still believes Officer Perrell lied to him.  Truthfulness is paramount

in law enforcement.  Any perceived animus by Chief Brous and/or Deputy Chief Shook, who

previously had amicable relations with Officer Perrell, stems from her perceived untruthfulness,

not her gender.  Plaintiff has not presented *any* evidence of malice or disregard of Plaintiff's civil

rights by Chief Brous and/or Deputy Chief Shook.  The surveillance is not indicative of malice

since there was a legitimate, nondiscriminatory reason and no materially adverse action was

taken against Officer Perrell.

D.      *42 U.S.C. § 1985(3) Claim*

        In paragraphs 13 through 15 of her Amended Complaint, Plaintiff alleges:

> 13.   Defendants Brous and Shook conspired to deprive Plaintiff
> Perrell of the equal protection of the laws and the equal privileges
> and immunities under the laws for the purpose of injuring her person
> and depriving her of the rights and privileges of a citizen of the
> United States, by subjecting her to sex discrimination and retaliation.
> . . .
>
> 14.   Defendants Brous and Shook did not act in good faith, but
> conspired individually and within the scope of their employment.
>
> 15.   Defendants Brous and Shook conspired and acted with actual
> malice and in reckless disregard for the civil rights of Plaintiff
> Perrell.

        To establish a cause of action under § 1985(3), Plaintiff must show "(1) a conspiracy of

two or more people (2) motivated by a specific class-based, invidiously discriminatory animus to

(3) deprive the plaintiff of the equal enjoyment of rights secured by law to all, (4) which results

in injury to the plaintiff as a consequence of an overt act committed by the defendants in

connection with the conspiracy." *Hunter v. Prince George's County.*, DKC-98-2434, 2001 U.S. Dist. LEXIS 1053, at *23 (D. Md. Jan. 31, 2001), *aff'd*, No. 01-1318, 2002 U.S. App. LEXIS 10698 (4th Cir. June 4, 2002).  Plaintiff fails to present evidence to support this claim.

Under the intra-corporate conspiracy doctrine, a corporation cannot conspire with its agents since the acts of the agents are the acts of the corporation.  The Fourth Circuit however recognizes two exceptions to this doctrine.

> The first is that a conspiracy may be found where the corporate agent "has an independent personal stake in achieving the corporation's illegal objective." *Greenville Publishing Co., Inc. v. Daily Reflector, Inc.*, 496 F.2d 391, 399 (4th Cir. 1974).  The second exception permits a conspiracy to be found where the agent's acts were not authorized by the corporation.  *Buschi* [*v. Kirven*], 775 F.2d [1240], 1252-53 [(4th Cir. 1985)].

*Cheatham v. Moore Regional Hosp.*, No. 3:96CV00020, 1997 U.S. Dist. LEXIS 6115, at *21 (M.D.N.C. Mar. 12, 1997), *aff'd*, No. 97-1489, 1997 U.S. App. LEXIS 25204 (Sept. 18, 1997).

Plaintiff accuses Chief Brous and Deputy Chief Shook of conspiracy, yet as Defendants outline in their Reply, Chief Brous was not involved in several instances that Plaintiff characterizes as discriminatory or retaliatory.  Defs.' Reply, at 23.  One alleged discriminatory action involved neither Chief Brous or Deputy Chief Shook.  Plaintiff offers no evidence which supports invoking either exception to the intra-corporate conspiracy doctrine.

E.       *42 U.S.C. § 1986 Claim*

In paragraphs 18 through 20 of her Amended Complaint, Plaintiff alleges:

> 18.    Plaintiff Perell identified to Defendants Brous, Shook and WSSC the nature of the sex discrimination and retaliation being committed and conspired against her on multiple occasions. Nonetheless, though Defendants had the power and authority to prevent or aid in preventing the commission of same, they neglected or refused to [do] so.

19.  At all relevant times, Defendants Brous and Shook were acting as agents/servants/employees of WSSC.

20.  Defendants failed to act with reasonable diligence to prevent or aid in preventing the gender discrimination to which Plaintiff Perrell was subjected, and the retaliation to which she was subjected.

Any person who is aware of wrongs prohibited by Section 1985(3) but refuses to take positive steps to prevent the wrongs are subject to liability under Section 1986.  *Williams v. Kansas Gas & Elec. Co.*, 805 F. Supp. 890, 901 (D. Kan. 1992) (citing *Drake v. City of Fort Collins*, 927 F.2d 1156, 1163 (10th Cir. 1991)).  "Without a violation of section 1985(3), there can be no violation of section 1986."  *Seguin v. City of Sterling Heights*, 968 F.2d 584, 590 (6th Cir. 1992).  Because Plaintiff failed to prove her Section 1985(3) claim, her Section 1986 claim is rejected.

## IV.  CONCLUSION

For the foregoing reasons, the court finds there are no genuine issues as to any material fact and thus Defendants are entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c). The court finds no need to address Defendants' Motion to Strike, which will be denied as moot. An Order will be entered separately.

July 31, 2006                                              /s/
_____                    _____
       Date                                              WILLIAM CONNELLY
                                                  UNITED STATES MAGISTRATE JUDGE